UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| WILLIAM A. DOYLE, III, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 18-005-DCR |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Inmate/Plaintiff William A. Doyle, III, is presently confined at the United States Penitentiary-McCreary ("USP-McCreary") in Pine Knot, Kentucky. Proceeding without an attonrey, Doyle filed a civil rights complaint asserting numerous claims against the United States and the following defendants: Mark S. Inch, Director of the Bureau of Prisons ("BOP"); J. Ray Ormond, Warden of USP-McCreary; Lieutenant B. Messer, a supervisor at USP-McCreary; and Officer Ronald Wilson, an employee at USP-McCreary. [Record No. 7] After reviewing Doyle's complaint, the Court dismissed all but Doyle's claim in Count 1 alleging a violation of the Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, 42 U.S.C. § 2000bb–1 to –4. [Record No. 20][1] The defendants then filed a motion to dismiss

---

[1] Shortly after filing his original complaint, Doyle filed a supplemental complaint [Record No. 7], seeking to add an additional claim under the RFRA ("Count 3"). This claim had not been administratively exhausted when he filed his original complaint. The Court permitted the supplement and clarified that, as the supplemental complaint re-stated the same claims made in the original complaint in full, the supplemental complaint would be construed as the operative pleading. [Record No. 20] However, Count 3 of the supplemental complaint was dismissed on screening. [*Id.*]

Count 1 of the complaint or, in the alternative, a motion for summary judgment. [Record No. 45] Doyle filed a response [Record No. 47] and the defendants filed a reply. [Record No. 53]

While the defendants' first dispositive motion on the RFRA claim was being briefed, Doyle filed a motion for leave to file an amended complaint seeking to add a claim alleging that Defendants Messer and Wilson retaliated against him for exercising First Amendment rights. [Record No. 48, 48-1 at Count 2] The Court permitted the amendment, but only to the extent that it added a retaliation claim against Messer and Wilson as set forth in Count 2 of the amended complaint. [Record No. 49, 50] However, because Doyle did not seek to amend his RFRA claim (Count 1), the Court clarified that briefing would continue on the defendants' first dispositive motion addressing Doyle's RFRA claim as pled in Count 1 of his supplemental complaint [Record No. 7] and that the defendants could respond separately to the retaliation claim set forth in Count 2 of the amended complaint. [Record No. 49][2]

The defendants then filed a second motion to dismiss or, in the alternative, a motion for summary judgment with respect to Doyle's retaliation claim set forth in Count 2 of the amended complaint. [Record No. 54] On October 1, 2018, Doyle filed a pleading captioned "Reply to Defendant's Response to their Motion to Dismiss Or Alternatively For Summary Judgment Count 1 and Count 2." [Record No. 60] To the extent that this pleading addresses arguments made by the defendants in their reply brief in further support of their first dispositive motion on Doyle's RFRA claim, this pleading constitutes an impermissible sur-reply filed without leave of Court. *See* LR 7.1(c), (g). However, this pleading also addresses arguments

---

[2] Although Doyle's proposed amended complaint also contained allegations related to a "Count 1" [Record No. 50], this count was identical to Count 1 of his supplemental complaint alleging violations of the RFRA. [Record No. 7]

made by the defendants in their second dispositive motion addressing Doyle's retaliation claim. [Record No. 60] Thus, to the extent that Doyle's pleading addresses the defendants' motion seeking dismissal or summary judgment on his retaliation claim, it may be construed as Doyle's response to the defendants' second dispositive motion. The defendants did not file a reply and the time for doing so has now expired. Thus, these matters have been fully briefed and are ripe for review.

## I.

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the plaintiff's complaint. *Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 364 (6th Cir. 2014). When addressing a motion to dismiss, the Court views the complaint in the light most favorable to the plaintiff and accepts as true all 'well-pleaded facts' in the complaint. *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). Because Doyle is proceeding without the benefit of an attorney, the Court reads his complaint to include all fairly and reasonably inferred claims. *Davis v. Prison Health Servs.*, 679 F.3d 433, 437-38 (6th Cir. 2012).

Here, the defendants have filed motions to dismiss and for summary judgment, attaching and relying upon declarations extrinsic to the pleadings in support of their motions. [Record No. 45] Thus, the Court will treat the defendants' motions to dismiss as motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(d); *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F. 3d 1102, 1104 (6th Cir. 2010). *See also Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (where defendant moves both to dismiss and for summary judgment, plaintiff is on notice that summary judgment is being

requested, and the court's consideration as such is appropriate where the nonmovant submits documents and affidavits in opposition to summary judgment).

A motion under Rule 56 challenges the viability of an opposing party's claim by asserting that at least one essential element of that claim is not supported by legally-sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). A party moving for summary judgment must establish that, even viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact and that the party is entitled to a judgment as a matter of law. *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994). However, if the responding party's allegations are so clearly contradicted by the record that no reasonable jury could adopt them, then the court need not accept them when determining whether summary judgment is warranted. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must grant summary judgment if the evidence would not support a jury verdict for the responding party with respect to at least one essential element of his claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

## II.

The facts relevant to Count 1 of Doyle's complaint are not generally in dispute. According to Doyle, he is an adherent to the Hanafi School of Al-Islam and has a sincerely-held belief that, for the five daily prayers, Muslims must prayer together at specified times whenever possible. [Record No. 7 at ¶ 8; Record No. 47 at ¶ 2] Count 1 of his complaint challenges the validity of the policies of the BOP and USP-McCreary authorizing inmates to pray only individually or in small groups of two or three inmates. [Record No. 7 at ¶¶ 54-57]

-4-

Doyle alleges that, on two different occasions in September 2016, he and/or other Muslim inmates with whom he was praying were informed by Messer that they could only pray in a group of two or three. [Record No. 7 at ¶¶ 19-27, 29] He further alleges that the long-held policies of both the BOP and USP-McCreary restrict inmate prayer to small groups of two to three inmates. [*Id*. at ¶¶ 16, 30-32, 55]

According to the defendants, the group prayer policy at USP-McCreary was implemented in response to the requirements of BOP Program Statement ("PS") 5360.09, Religious Beliefs and Practices, which requires that the BOP provide "inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution and the [BOP]" 28 C.F.R. § 548.10(a). [Record No. 45-3, Exh. 2, Decl. of Michael Jones, Supervisory Chaplain, USP-McCreary at ¶ 3-4] To comply with this requirement, USP-McCreary implemented Institutional Supplement MCR-5360.09, Religious Beliefs and Practices. [*Id*. at Jones Decl. at ¶ 4].

With respect to inmate prayer, the current version of this supplement, MCR-5360.09j, provides as follows:

> Inmates who are religiously motivated to pray in groups may do so as follows: In the housing unit, one inmate may have one or two additional inmates pray with him in his assigned cell, but the total number of occupants must not exceed three inmates. At work details, Education areas, or Recreation areas, up to three inmates may pray in an area designated by a staff member supervising that detail or assignment. The inmate(s) must first inform the staff member of the need to pray in a group before engaging in the group prayer. Up to three inmates may pray at one time, but no more than three. If more than three inmates desire to pray, a first set of inmates may pray and when they are finished, a second set of inmates may pray.

[Record No. 45-3, Attachment A, MCR 5360.09j(Q) (effective December 1, 2017) at p. 12]
Although other versions of this supplement have been in place during the time period relevant
to this lawsuit, both of these versions similarly restricted prayer groups to small groups of two
to three inmates. [Record No. 45-3, Attachment B, MCR 5360.09h(k)(4) (effective October
15, 2015) at p. 10 (providing that inmates may pray individually or in small groups of two or
three inmates and that a request for an opportunity to pray can be made at work detail sites,
school, or units during break times); Record No. 45-3, Attachment C, MCR-5360.09i(Q)
(effective September 13, 2016) at p. 12 (providing that, outside the institution chapel, inmates
could pray individually or in a group of no more than three inmates within their assigned cell
or, with prior approval of a supervising staff member, while the inmate is on work detail, in
education, or other mandatory assignment, as well as in recreation areas)]

Doyle claims that it is his sincerely-held belief that, at a prayer time, all the Muslims
who are present must pray together. [Record No. 47 at ¶ 24] Thus, he argues that the policies
limiting prayer groups to no more than three inmates violate the RFRA when applied to him
because they fail to allow for congregate prayer involving more than three inmates for the five
daily prayer times required by his faith. [Record No. 47 at ¶ 7, 11-12] He also argues that
these policies deny him the right to join a prayer already in progress, which he also asserts is
one of the fundamental tenets of Al-Islam. [Record No. 47 at ¶ 33]

The RFRA prohibits the federal government from "substantially burden[ing]" a
person's exercise of religion even if the burden results from a rule of general applicability
unless the government can demonstrate that "application of the burden to the person—(1) is in
furtherance of a compelling governmental interest; and (2) is the least restrictive means of
furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a), (b). Thus, Doyle

must first show that the Government "substantially burdened" his exercise of religion to establish a violation of the RFRA. 42 U.S.C.A. § 2000bb-1(a); *United States v. Girod*, 159 F.Supp.3d 773, 777 (E.D. Ky. 2015). "Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions . . ." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963); *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). *See also Adkins v. Kaspar*, 393 F.3d 559, 569–70 (5th Cir. 2004) (interpreting the identical "substantial burden" standard of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc–1.)[3] However, "a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." *Adkins*, 393 F.3d at 569-70.

The defendants argue that Doyle fails to allege that his ability to practice his religion has been substantially burdened because the group prayer policy at USP-McCreary does not completely ban group prayer for purposes of the five daily prayers. Rather, it limits inmate group prayer to small groups, either in their cells or in other areas of the institution with prior approval. The defendants also point out that Doyle has the opportunity to participate in group

---

[3] The RLUIPA and the RFRA are sister statutes. The RLUIPA was enacted to apply to States and their subdivisions after the Supreme Court held in *City of Boerne v. Flores*, 521 U.S. 507 (1997) that Congress exceeded its powers in making the RFRA applicable to the States and their subdivisions. *Holt v. Hobbs*, 135 S.Ct. 853, 859-860 (2015). The statutory language of the RLUIPA regulating religious exercise by institutionalized persons, 42 U.S.C. § 2000cc-1, mirrors that of the RFRA. *Id*. at 860.

prayer with larger groups of Muslim inmates on a weekly basis at the Friday Jumah prayer service at the institutional chapel. Thus, according to the defendants, because Doyle does not allege that he sought approval for group prayer and was denied, nor that he was prohibited from praying in a small group of two to three inmates, he fails to show that his exercise of religion has been substantially burdened. [Record No. 45-1 at p. 12-13]

But Doyle claims it is his belief that, at the five daily prayer times, *all* Muslims who are present must pray together, regardless of number. [Record No. 47 at ¶¶ 2, 24]. He further asserts that it is a "fundamental tenant" of his religious beliefs that, if he sees a prayer in progress and has not yet prayed himself, he should join it. [*Id*. at ¶¶ 33, 38] The theological legitimacy of a particular religious practice is not in question under RFRA. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778, 189 L.Ed.2d 675 (2014) (describing question of reasonableness of religious belief one "that the federal courts have no business addressing"); *Bible Believers v. Wayne County, Mich.,* 805 F.3d 228, 256 (6th Cir. 2015) (citing *Fowler v. Rhode Island,* 345 U.S. 67 (1953) ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment.")).

Although the policies in place at USP-McCreary permit group prayer in small groups of no more than three, they do not permit the more inclusive group prayer that Doyle claims is required according to his religious beliefs. Assuming, without deciding, that the policy's group size limitation substantially burdens Doyle's religious beliefs that all Muslims present at the five daily prayer times must pray together and that he must join prayers that he sees in progress, these policies may still be permissible if the defendants demonstrate that the application of this burden to Doyle "(1) is in furtherance of a compelling governmental interest; and (2) is the

least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b).

Here, the defendants assert that limiting the size of prayer groups serves a compelling government interest in maintaining the security and orderly running of USP-McCreary. [Record No. 45 at p. 14] They submit the Declaration of Michael Jones, Supervisory Chaplain at USP-McCreary, who explains that, in the prison setting, large groups of inmates gathered together in one location can present a security threat, as it will often be interpreted by other groups of inmates to be a "show of force" or an attempt to demonstrate that group's strength within the prison, which can lead to similar or escalated shows of force by other groups. [Record No. 45-3, Jones Decl. at ¶ 10] Such shows of force can lead to assaults, fights, and/or riots, posing a significant risk of serious injury to inmates and staff. [*Id.*] Jones further states that large groups of inmates can physically impede staff members responding to fights, medical emergencies, or other situations needing immediate attention. [*Id.* at ¶ 11]

Jones also explains that, in the prison setting, prisoners are often grouped together based on religious affiliation, geographic proximity of the state or area where the inmates lived prior to incarceration, race and/or national origin. [*Id.*] According to Jones, providing a benefit to one group of inmates based on their religious affiliation, such as the opportunity to gather in a large, unsupervised group, and not making the same benefit available to other groups, can lead to tension between the groups, as well as tension between the group denied the benefit and prison staff members. [*Id.*] This tension raises security concerns, as it often leads to insolence toward staff, fights between rival groups, and potential assaults on staff members. [*Id.*]

Doyle concedes this point, stating that "[t]he Defendants undoubtedly [have] a compelling interest in maintaining prison security." [Record No. 47 at ¶ 13] He argues,

however, that the defendants fail to demonstrate that the policy limiting prayer group size to two to three inmates is the least restrictive means of furthering this security interest. And he contends that he has demonstrated on two occasions (on September 11 and 12, 2016) that five and six Muslims can pray together at prayer time without disruption of the BOP's system. [*Id.* at ¶ 17] He also claims that other inmates are allowed to gather in groups of more than three inmates for activities such as basketball, baseball, and flag football, which he argues shows that less restrictive means are available to address the defendants' security concerns arising from permitting prayer in large groups. [*Id.* at ¶37, 54]

However, by the terms of the statute, the RFRA requires a particularized analysis regarding whether the defendants demonstrate that the application of the burden *to Doyle* is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1(b). The defendants argue that staff at USP-McCreary have a compelling interest in the application of the group prayer policy particularly to Doyle, as he is currently serving a life sentence for offenses involving large-scale gang activity and racketeering, which was based on underlying predicate acts of multiple counts of murder, including the murder of rival gang members, attempted murder, and distribution of controlled substances. [Record No. 53 at p. 5] *See also United States v. Doyle*, 121 F.3d 1078, 1081-83 (7th Cir. 1997) (describing the indictment and scope of the racketeering conspiracy charged in Doyle's underlying criminal case, *United States v. Doyle*, No. 1:89-cr-908-12 (N.D. Ill.)). Thus, the defendants assert that, based on Doyle's past criminal history (including past gang activity), the prison has a particular interest in limiting his access to pray with other inmates in a group of any size and at any location in the institution. The defendants further note that Doyle is not prohibited from

participating in group prayer completely. Instead, he may pray in groups of limited size and in compliance with the procedures set forth in the policy.

In the prison context, maintaining order and safety is a compelling interest. *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 369-70 (6th Cir. 2005); *Jones v. Shabazz*, 352 Fed. App'x. 910, 915 (5th Cir. 2009) (recognizing prison security problems, staffing limitations, and space constraints as compelling government interests). In interpreting the similar "compelling interest" requirements of the RLUIPA, the Supreme Court has explained that it does "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005). The Court further explained that:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, see *supra,* at 2118, "[c]ontext matters" in the application of that standard. *See Grutter v. Bollinger,* 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. *See, e.g.,* 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Joint Statement 16699 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900)."

*Id.* at 722-23.

In *Holt* (also in the context of interpreting the similar provisions of the RLUIPA), the Supreme Court pointedly emphasized "that although RLUIPA provides substantial protection for the religious exercise of institutionalized persons, it also affords prison officials ample ability to maintain security." *Holt*, 135 S.Ct. at 866. Moreover, the United States Court of Appeals for the Sixth Circuit has specifically cautioned against a district court substituting its

judgment in place of the experience and expertise of prison officials, instructing that, in interpreting the RFRA "courts must give due deference to the judgment of prison officials, given their expertise and the significant security concerns implicated by prison regulations." *Hoevanaar*, 422 F.3d at 370.

The Court finds that, in this case, the defendants have a compelling interest in maintaining the security and the orderly running of USP-McCreary, particularly in restricting the size of groups of inmates that may gather at any particular time. The Court further gives due deference to the judgment of prison officials regarding the need to limit Doyle's ability to participate in group prayer five times daily in groups of unlimited size, particularly given his past history of gang activity. Moreover, the application of the group prayer policy to Doyle is the least restrictive means of furthering this interest, as it provides him with the opportunity to participate in group prayer while balancing the legitimate security needs of the institution.

Although Doyle claims that prisoners are permitted to gather in larger groups for sports, he does not suggest that inmates are permitted to gather in these groups at any time or place they choose, or without obtaining prior permission. As the Supreme Court instructed in *Cutter*, "context matters" in application of the RFRA standards. *Cutter*, 544 U.S. at 723. In essence, Doyle would have the Court find that the RFRA requires that inmates be permitted to gather in groups for purposes of prayer five times a day with no restrictions. However, to require prison staff to permit Doyle the unfettered ability he seeks to participate in the five daily prayers in groups of unlimited size would "elevate accommodation of religious observances over an institution's need to maintain order and safety," a reading of the RFRA that *Cutter* specifically cautioned against. *Id*. at 722 (interpreting the RLUIPA).

In summary, the Court finds and concludes that, even if the defendants' group prayer policies substantially burden Doyle's religious beliefs, the policies in issue are the least restrictive means of furthering the compelling governmental interest of maintaining security and order at USP-McCreary. Thus, Doyle's claim that the defendants' group prayer policies violate the RFRA fails and the defendants' motion for summary judgment [Record No. 45] will be granted. Because there is no RFRA violation, the Court need not address the defendants' argument that they are entitled to qualified immunity with respect to Doyle's RFRA claim.

### III.

Doyle alleges in Count 2 of his amended complaint that he "received intentional harassment and retaliation because he filed grievances against staff concerning his prayers" in violation of his constitutional rights. [Record No. 50 at p. 8] He refers to incidents on September 11, 2016, and September 12, 2016, in which he alleges that he led groups of fellow Muslim prisoners larger than three in prayer. On both occasions, he claims that Lt. Messer came onto the yard with other officers, waited for the prayer to be finished, and called one of the participants over to remind him that group prayer was only permitted in groups of two or three. [*Id.* at ¶¶ 19-29][4]

Doyle further asserts that, on the morning of December 6, 2016, he was eating in the chow hall when he asked a fellow Muslim inmate who works in the dining hall to switch places

---

[4] According to Doyle, on September 11, 2016, Messer indicated that three prisoners may pray together, while on September 12, 2016, Messer was "adamant" that the group be limited to two. [*Id.* at ¶¶ 21-22, 25-29]. However, both positions were consistent with USP-McCreary's group prayer policy in place at that time. [Record No. 45-3, Attachment B, MCR 5360.09h(k)(4) (effective October 15, 2015) at p. 10 (providing that inmates may prayer individually or in small groups of two or three inmates)]

with him so that he could be by the wall for his morning prayer. [*Id*. at ¶ 39] The inmate agreed and offered to stand behind Doyle until he was finished. [*Id*.] Doyle alleges that, as he was finishing his prayer, he heard keys and radios from officers, which he alleges were called by Messer in retaliation against Doyle because Doyle had prayed and because he had previously filed administrative grievances concerning the group prayer policy against him. [*Id*. at ¶40] Doyle alleges that Messer then informed the Muslim inmate standing behind him that, although that inmate was permitted to pray in the kitchen because he worked there, Doyle did not work in the kitchen, thus he could not pray there.[5] [*Id*. at ¶ 41]

Doyle states that, after he and the other inmate were escorted to a holding cell, Messer approached and advised him that, although he allowed Doyle to finish his prayers without interruption on September 11 and 12, 2016, and he allowed him to finish his prayers without interruption on December 6, 2016, the next time Messer observed him praying in a place where he did not approve, Messer would physically remove Doyle. [*Id*. at ¶ 43] Doyle interpreted this comment as a threat to attack him while he was praying. [*Id*.] Doyle then states that he received an incident report on December 6, 2017, for Conduct Which Disrupts the Security or Orderly Running of the Institution (299), Most Like, Engaging In or Encouraging a Group Demonstration (212), written by Messer, which he claims was retaliatory. [*Id*. at ¶ 47] However, this incident report was later expunged. [*Id*. at ¶ 67]

_____

[5] Again, Messer's instructions regarding the location of Doyle's prayer were consistent with USP-McCreary's prayer policy permitting an inmate to pray at his respective work detail, but only in an area designated by the staff member supervising that detail and only after first informing the supervising staff member. [Record No. 45-3, Attachment A, MCR 5360.09j(Q) (effective December 1, 2017) at p. 12] Doyle was not in the dining hall on assigned work detail, but rather was there to eat before starting his class for electricians. [Record No. 50 at ¶¶ 35-37]

Doyle also alleges that, after he had been in the holding cell for two to three hours, SIS Officer Phillips came into the cell to talk with him about the incident in the dining hall. Phillips informed Doyle that his property had been packed and that Doyle would be going to the Special Housing Unit ("SHU"). [*Id*. at ¶ 46] Doyle states that, while he was in the cell, Officer Phillips saw something under the toilet, but that Doyle denied that it belonged to him. [*Id*.]

On December 13, 2016, Doyle received an incident report written by Wilson, charging him with Possession of a Weapon (104). [*Id*. at ¶ 47] The December 6, 2017 incident report stated that, as Wilson was walking past Doyle's cell, Doyle told him that a weapon (a shiv) was in the cell underneath the toilet. [*Id*. at ¶ 49] According to Doyle, Wilson later told him that Phillips had told Wilson to write-up the incident report, even though Wilson did not find anything in Doyle's cell. [*Id*. at ¶¶ 50-54] Doyle's claims that Wilson wrote-up the incident report to retaliate against him for praying and filing grievances. As relief for his retaliation claims, Doyle seeks compensatory and punitive damages from Messer and Wilson. [*Id*. at p. 10]

Doyle seeks monetary damages for his retaliation claims pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), which held that an individual may "recover money damages for any injuries . . . suffered as a result of [federal] agents' violation of" his constitutional rights. *Id*. at 397. Doyle claims that he was retaliated against both for practicing his religion and for filing grievances, both of which are protected by the First Amendment. *Bell v. Johnson*, 308 F.3d 594, 609-10 (6th Cir. 2002) (prisoner's claim that officials retaliated against him for filing grievances was squarely covered by First Amendment, precluding due process claim under Fourteenth Amendment).

The Supreme Court has repeatedly indicated that a First Amendment claim for damages is not cognizable under *Bivens*. *See Reichle v. Howards*, 566 US 658, 665 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."); *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment . . ., we have not found an implied damages remedy under the Free Exercise Clause. Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment.") (citations omitted); *Bush v. Lucas*, 462 U.S. 367, 387-89 (1983) (First Amendment retaliation claim was not cognizable under *Bivens*). While the Supreme Court has expressly acknowledged the availability of the remedy for claims arising under the Fourth and Eighth Amendment, it has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001).

In *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017), the Supreme Court re-emphasized that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," explaining that,

> [w]hen a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis. The question is "who should decide" whether to provide for a damages remedy, Congress or the courts? *Bush,* 462 U.S. at 380, 103 S.Ct. 2404.

> The answer most often will be Congress. When an issue "'involves a host of considerations that must be weighed and appraised,'" it should be committed to "'those who write the laws'" rather than "'those who interpret them.'" *Ibid.* (quoting *United States v. Gilman,* 347 U.S. 507, 512–513, 74 S.Ct. 695, 98 L.Ed. 898 (1954)).

*Id*. at 1857. Given these considerations, the Court explained that "a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id*. at 1857 (quoting *Carlson v. Green*, 226 U.S. 14, 18 (1980)).

The defendants have identified several "special factors" that the Court agrees counsel hesitation in extending a *Bivens* remedy to Doyle's claims. First, given that the Supreme Court has never recognized a *Bivens* remedy under the First Amendment in any context, the Court is reluctant to recognize one here. Moreover, as instructed by the Supreme Court, this Court should consider "the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (citation omitted). *See also Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability.") (citation omitted). Here, there are "alternative, existing" processes available for protecting Doyle's interests, including the BOP's administrative remedy process, which Doyle successfully used to grieve his complaints and have the December 2016 incident reports expunged. [Record No. 50 at ¶¶ 56, 67]

This Court also recognizes that to extend *Bivens* liability in the First Amendment context presented here would impose substantial costs, in both time and money, upon individual officers and employees of the federal government. *See Abbasi*, 137 S.Ct. at 1856. And Congress has previously recognized the need to limit frivolous prisoner litigation in federal courts by passing the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). Through the PLRA, Congress addressed the challenge of "ensuring that the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 203 (2007). Thus, expanding *Bivens* liability in this context requires consideration of the potential imposition of costs upon the government, as well as the risks of an increase of

frivolous prisoner litigation.  The Court finds that these factors further "counsel hesitation" in extending *Bivens* liability to First Amendment claims, as balancing these public policy concerns is more appropriately addressed by Congress rather than the court.  For all of these reasons, the undersigned finds that *Bivens* does not extend to provide an available money damages remedy for Doyle's retaliation claim.

But even if *Bivens* did afford a remedy, Doyle's allegations fail to state a retaliation claim.  To establish a claim of First Amendment retaliation, "a prisoner must prove: (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected conduct.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Thaddeus–X v. Blatter,* 175 F.3d 378, 394, 398 (6th Cir. 1999)(en banc)).  Although retaliation can rarely be supported by direct evidence of the required intent, "conclusory allegations of retaliatory motive unsupported by material facts" are not sufficient to state a claim.  *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (citations and quotation marks omitted).  To establish causation, the plaintiff must set forth "a chronology of events from which retaliation may plausibly be inferred."  *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).

In this case, Doyle has not presented evidence on which a reasonable trier of fact could find that the incident reports issued in December 2016 were motivated by either Doyle's exercise of religion or his filing of grievances in September 2016.[6]  Indeed, "[a] pure temporal

---

[6]  Doyle claims that he first submitted informal resolution forms (thus beginning the grievance process) for the September 11 and 12, 2016 incidents on September 13, 2016.  [Record No. 60 at p. 8; Record No. 1-3 at p. 23]

relationship (A occurred after B) is not enough to establish a causal connection." *Coulson v. The Goodyear Tire & Rubber Co.*, 31 Fed. App'x 851, 859 (6th Cir. 2002). This is particularly true where, as here, almost three months passed between Doyle's filing of a grievance on September 13, 2016 and the incident reports written by Messer and Wilson in December 2016. *See Vaughn v. Robb*, 2012 WL 769481 at *4 (W.D. Mich. 2012) (six-week time period between prisoner's complaint and subsequent misconduct charge insufficient to establish the requisite causal link).

Moreover, Doyle admits in his allegations that his group prayers on September 11 and 12, 2016, violated the prison's group prayer policy with respect to group size, [Record No. 50 at ¶¶ 19, 23], and that his prayer in the dining hall on December 6, 2016, violated the policy with respect to permissible location. [*Id.* at ¶¶ 39-41] Indeed, the comments that he attributes to Messer on both occasions simply re-state the applicable group prayer policies in place at those particular times. Although Doyle characterizes Messer as "adamant" about the policy requirements and claims that he was "upset" and used a "loud voice" [Record No. 50 at ¶¶ 29, 40-43], these conclusory assertions are insufficient to establish that Messer was motivated by anything other than proper enforcement of prison policy. Moreover, he makes no allegations that would support a finding that Wilson was even aware of, much less motivated by, Doyle's exercise of religion and/or his prior grievances.

Therefore, Doyle's First Amendment retaliation claims against Messer and Wilson fail because he has not alleged facts sufficient to support a reasonable inference of a causal connection between his conduct and the incident reports issued in December 2016. Because the Court finds that Doyle fails to state a retaliation claim against Messer or Wilson, it declines to address the defendants' argument that they are entitled to qualified immunity on this claim.

## IV.

For the reasons outlined above, it is hereby **ORDERED** as follows:

1.      The defendants' motions [Record No. 45, 54] are **GRANTED**, to the extent that they seek summary judgment.

2.      Doyle's supplemental complaint [Record No. 7] and amended complaint [Record No. 50] are **DISMISSED WITH PREJUDICE**.

3.      Any pending requests for relief by Doyle are **DENIED AS MOOT**.

4.      This action is **DISMISSED** and **STRICKEN** from the Court's docket.

Dated: November 13, 2018.

Signed By:

*Danny C. Reeves*

United States District Judge